# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID PAUL LEE,<br><br>                                    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>                                    Defendant. | Case No.: 3:20-cv-01596-H-BGS<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>[Doc. No. 16.]<br><br>**(2) GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 19.] |

On August 18, 2020, Plaintiff David Paul Lee ("Plaintiff") filed a complaint against Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner" or "Defendant"), seeking judicial review of an administrative denial of disability benefits under the Social Security Act ("SSA"). (Doc. No. 1.) On April 30, 2021, the Commissioner

---

[1] Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, is substituted for her predecessor, Andrew Saul, Commissioner of Social Security, pursuant to Fed. R. App. P. 43(c)(2).

3:20-cv-01596-H-BGS

lodged the administrative record. (Doc. No. 11.) On July 14, 2021, Plaintiff filed a motion for summary judgment. (Doc. No. 16.) On September 16, 2021, the Commissioner filed a cross-motion for summary judgment and a response in opposition to Plaintiff's motion. (Doc. No. 19.) For the reasons below, the Court denies Plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and affirms the Commissioner's final decision

## **BACKGROUND**

Plaintiff was born in 1956. (Administrative Record ("AR") 195.) Plaintiff graduated from high school, took college courses at Mesa College, and earned a diploma in computers from Coleman College. (AR 38.) Plaintiff last worked on May 12, 2015 in call center technical support, a job he had held for approximately 15 years. (AR 42.) On May 4, 2016, Plaintiff filed a Title II application for Social Security Disability Insurance (SSDI) Benefits, claiming a disability onset date of May 12, 2015 when he was 58 years old. (AR 195–98.) In his application for disability benefits, Plaintiff asserted disability resulting from a cervical spine injury, chronic pain due to the spine injury, limited mobility, anxiety, and depression. (AR 76, 102.)

On September 20, 2016, the Social Security Administration ("SSA") denied Plaintiff's application. (AR 75–87.) On January 10, 2017, the SSA denied Plaintiff's application for reconsideration. (AR 88–101.) On March 7, 2017, Plaintiff filed a written request for a hearing. (AR 112–13.) On July 17, 2018, Plaintiff appeared at a hearing held in San Diego, CA. (AR 129.) Because Plaintiff did not have a representative at the July 17, 2018 hearing, the hearing was postponed at Plaintiff's request so Plaintiff could find a representative. (AR 15, 156–61.) On, June 6, 2019, a supplemental hearing was held in San Diego, CA. (AR 31–74, 181.) Plaintiff was represented by attorney Dan Richard Cohen. (AR 31–74.) Impartial vocational expert Alan E. Cummings also appeared at the supplemental hearing. (AR 31, 37–39.)

On July 3, 2019, the ALJ issued a written decision concluding that Plaintiff was not disabled within the meanings of the SSA from May 12, 2015 through the date of the

ALJ decision. (AR 12–30.) On August 24, 2019, the Appeals Council received Plaintiff's request for review of the ALJ's decision. (AR 7–8.) On June 18, 2020 the Appeals Council denied Plaintiff's request for review and finalized the ALJ's decision. (AR 1–6.) On July 14, 2021, Plaintiff filed a motion for summary judgment seeking judicial review of the Commissioner's final decision. (Doc. No. 16.) On September 16, 2021, the Commissioner filed a cross-motion for summary judgment and a response in opposition to Plaintiff's motion requesting the Court to affirm the final decision of the Commissioner. (Doc. No. 19.)

## DISCUSSION

### I. Legal Standards

#### A. Standard for Determining Disability

Under the Social Security Act, "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically or mental impairment which can be expected to result in death or which has lasted for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant "shall be determined to be under disability only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential evaluation process is used for determining whether a person is disabled. 20 C.F.R. § 404.1520; Ludwig v. Astrue, 681 F.3d 1047, 1048 n.1 (9th Cir. 2012). "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." Maxwell v. Saul, 971 F.3d 1128, 1130 n.2 (9th Cir. 2020) (citing Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequent, there is no need to consider subsequent steps." Tackett, 180 F.3d at 1098; 20 C.F.R. § 404.1520(a)(4).

At step one, the ALJ considers if the claimant is working and if the work is a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i),(b). If so, the ALJ will find the

claimant not disabled. Id. At step two, the ALJ considers whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii),(c). If none of claimant's impairments are severe, the ALJ will find the claimant not disabled. Id. At step three, the ALJ considers whether the claimant's impairments meet or equal one of the several enumerated impairments that are deemed so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(ii),(d). If a claimant's impairments meet or equal one of the enumerated impairments, the ALJ will find the claimant disabled. Id. If not, the ALJ will assess and make a finding about the claimant's residual functional capacity ("RFC") before proceeding to step four. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is the most a claimant can do despite the claimant's physical and mental limitations caused by a claimant's impairments and any related symptoms. 20 C.F.R. § 404.1545(a)(1).

At step four, the ALJ considers the claimant's RFC to determine if the claimant can still do the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv),(f). If so, the ALJ will find the claimant not disabled. Id. If the claimant cannot perform their past relevant work, the ALJ proceeds to step five and considers the claimant's RFC, age, education, and work experience to determine if the claimant can make an adjustment any other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v),(g); see also Tackett, 180 F.3d at 1100–01. If the claimant can make an adjustment to other work, the ALJ will find claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the ALJ will find the claimant disabled. Id.

### B. The ALJ's Consideration of Medical Opinion Evidence

For claims filed before March 27, 2017, such as Plaintiff's claim, the ALJ follows specified rules to evaluate medical opinion evidence. 20 C.F.R. § 404.1527. "The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). Medical opinions "are statements from

acceptable medical sources that reflect judgment about the nature and severity of [a claimants] impairment(s)" and are considered by the ALJ together "with the rest of the relevant evidence receive" in determining if a claimant is disabled. 20 C.F.R. § 404.1527(a)(1),(b). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); see also 20 C.F.R. 404.1502 (2016).

A treating physician's opinion is generally given more weight than that of a physician who did not treat the claimant. 20 C.F.R. § 404.1527(c)(2). Similarly, an examining physician's opinion is given more weight than the opinion of a nonexamining physician. 20 C.F.R. § 404.1527(c)(1); see also Ryan v. Comm'r Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citing Lester, 81 F.3d at 830). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan, 528 F.3d at 1198 (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. (citing Lester, 81 F.3d at 830–31). The ALJ can meet the "specific and legitimate reasons" burden "by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation therefor, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).

Opinions on some issues are "reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). Opinions on issues reserved to the Commissioner include whether a claimant is disabled, whether a claimant is unable to work, and the claimant's RFC. 20 C.F.R. § 404.1527(d)(1),(2). Opinions on issues reserved to the Commissioner made by physicians, including treating physicians,

are not considered medical opinions and ALJs will "not give any special significance to the source of [such] opinion." 20 C.R.F. § 416.927(d)(1),(3). However, the ALJ cannot reject a treating or examining physician's opinion on the ultimate issue of disability without providing clear and convincing reasons if the opinion is uncontradicted and specific and legitimate reasons if the opinion is contradicted. See Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014); Hill v. Astrue, 698 F.3d 1153, 1160 (9th Cir. 2012).

### C. Standard of Review

Unsuccessful applicants can seek judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g). Upon review, the district court must affirm the Commissioner's decision if it was supported by substantial evidence and based on proper legal standards. Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005). Substantial evidence means "more than a mere scintilla but less than a preponderance." Sandgathe v. Charter, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). The court considers the record as a whole, weighing both the evidence that supports and undermines the Commissioner's conclusions. Id.; Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575–76 (9th Cir. 1988). "Where evidence can rationally be interpreted in more than one way, the court must uphold the Commissioner's decision." Mayes v. Massanar, 276 F.3d 453, 459 (9th Cir. 2001).

A reviewing court will not reverse an ALJ's decision for harmless error. Tommasetti, 533 F.3d at 1038. An error is harmless "when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Id. (internal quotation marks omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009)).

## II. Analysis

Here, the ALJ proceeded through four of the five steps for determining disability until the ALJ found Plaintiff not disabled at step four. (AR 17–25.) At step one, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of May 12, 2015. (AR 17.) At step two, the ALJ found that Plaintiff had medically determinable severe impairments of a:

> [S]table small to moderate control and left paracentral C7-T1 disc protrusion with T2 hyperintense annular fissure, with stable tiny to mild central disc protrusion between C2-3 and C4/5; previous anterior interbody fusion between C5 and C7, stable old mild superior T2 end plate compression deformity, history of old mild T2 compression fracture, history of cervical fusion without spinal stenosis, cervical radiculopathy, and mild focal median neuropathy at the right carpal tunnel.

(Id.) The ALJ also found Plaintiff had non-severe medically determinable mental impairments of anxiety and depression. (Id.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the enumerated impairments. (AR 19.) The ALJ then determined that the Plaintiff has the RFC to:

> [L]ift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; able to stand and/or walk 6 hours and sit 6 hours in an 8 hour workday with normal breaks; able to reach overhead frequently bilaterally. In addition, the claimant cannot engage in more than occasional rotation, flexion, or extension of the neck; frequently able to handle and finger bilaterally; should avoid concentrated exposure to loud noises.

(Id.) At step four, the ALJ considered Plaintiff's RFC, relevant work history, and the testimony of the vocational expert to conclude that Plaintiff is capable of performing past relevant work as a technical support specialist help desk representative. (AR 24.) The ALJ then determined that Plaintiff was not disabled from May 12, 2015, the onset date, through July 3, 2019, the date of the ALJ's decision. (Id.) Because the ALJ found Plaintiff not disabled at step four, the ALJ did not continue to step five.

Plaintiff argues (1) the ALJ's improperly found Plaintiff's medically determinable mental impairments of anxiety and depression were not severe at step two and failed to consider Plaintiff's mental impairments at later steps; (2) the ALJ failed to provide a sufficient basis for rejecting the medical opinions of treating physicians Dr. Larry D. Dodge, M.D. and Dr. Kevin T. Toliver, M.D. in assessing Plaintiff's RFC; (3) and the

ALJ improperly made an adverse credibility determination against Plaintiff. (Doc. No. 16 at 3–36.) The Court addresses each of Plaintiff's arguments in turn below.

### A. Plaintiff's Mental Impairments

Plaintiff argues that the ALJ's finding that Plaintiff's medically determinable mental impairments of depression and anxiety were non-severe at step two is not supported by substantial evidence. (Doc. No. 16 at 4.) Specifically, Plaintiff argues the ALJ improperly rejected treating and examining physician's opinions regarding the extent Plaintiff's depression and anxiety interfered with Plaintiff's ability to sustain work activity. (Id. at 4–15.) Plaintiff also argues the ALJ improperly failed to consider Plaintiff's mental impairments when determining Plaintiff's RFC. (Id. at 16–18.) The Commissioner argues the ALJ provided specific and legitimate reasons for discrediting the medical opinion testimony and the ALJ's findings regarding Plaintiff's mental impairments were supported by substantial evidence. (Doc. No. 19 at 3.) The Court agrees with the Commissioner.

If a claimant makes a colorable claim of mental impairment, the ALJ is required to apply a special technique at step two to rate the degree of functional limitations resulting from the mental impairments in four different areas: "activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation." Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also 20 C.F.R. § 404.1520a(c)(3). Legal error occurs when the ALJ neglects to document his application of the technique or fails to include a specific finding as to the degree of limitation in any of the four functional areas. Keyser v. Comm'r Soc. Sec. Admin., 648 F.3d 721, 726 (9th Cir. 2011). After rating the degree of limitation in each functional area, the ALJ then determines whether the claimant has a severe mental impairment. Averbach v. Astrue, 731 F. Supp. 2d 977, 980 n.4 (C.D. Cal 2010) (citing 20 C.F.R. § 404.1520a(d)).

At step two, the ALJ found that Plaintiff had medically determinable mental impairments of anxiety and depression. (AR 17.) The ALJ then considered the four broad functional areas set out in 20 C.F.R. § 404.1520a(c)(3). (AR 17–19.) The ALJ cited

Plaintiff's self-reported function report and the September 12, 2016 psychiatric disability examination conducted by examining physician Dr. Jaga Nath Glassman, M.D. in considering each of the four broad areas of mental functioning. (AR 18–19.) The ALJ found that Plaintiff had no limitations in the first functional area of understanding, remembering, or applying information and the third functional area of concentrating, persisting, or maintaining pace. (AR 18.) The ALJ also found that Plaintiff had mild limitations in the second functional area of interacting with others and the fourth functional area of adapting or managing oneself. (AR 18–19.) Because Plaintiff's mental impairments caused no more than mild limitations, the ALJ determined that Plaintiff's mental impairments were non-severe. (AR 19; see also 20 C.F.R. § 404.1520a(d)(1)).

First, Plaintiff argues the ALJ's finding that Plaintiff's mental impairments were non-severe was not supported by substantial evidence because the ALJ improperly discredited the medical opinion of examining physician Dr. Glassman concerning the impact of Plaintiff's mental impairments on the third and fourth functional areas. (Doc. No. 18 at 6. ) On September 12, 2016, Dr. Glassman, a board-certified psychiatrist, conducted a psychiatric disability evaluation of Plaintiff. (AR 473–78.) Dr. Glassman indicated her evaluation was based on an interview with Plaintiff on August 31, 2016 and a self-report questionnaire sent to Dr. Glassman by the Disability Determination Service ("DDS"). (Id. at 473.) In her report, Dr. Glassman noted Plaintiff's report that he feels incapable of performing simple or basic work and has decreased focus and concentration because of his pain. (Id. at 474.) Dr. Glassman also noted that Plaintiff feels discouraged, depressed, and anxious at times, but is not depressed all the time. (Id.) Dr. Glassman noted Plaintiff had previously received mental health counseling but stopped because he found it unhelpful, and Plaintiff was taking Zoloft and trazodone. (Id. at 474–75.)

Dr. Glassman conducted a mental status examination and observed that Plaintiff was "well-developed," "well-nourished-appearing," and appeared "his stated age." (Id. at 475.) Dr. Glassman further observed Plaintiff was "clean, neat, well-groomed, and attractive in his physical presentation." (Id.) Dr. Glassman observed Plaintiff was "calm,

cooperative, polite, and respectful in his attitude and demeanor," "appeared physically uncomfortable, in pain," had "some mild depression and anxiety, and some mild agitation," spoke "in a soft monotone, with little elaboration or spontaneity" and with "no real positive effect." (Id. at 476.) Dr. Glassman observed Plaintiff had "some degree of dramatic quality" and "tended to ramble to some degree about his physical problems." (Id.) Dr. Glassman observe Plaintiff's thought process was "coherent, relevant, and goal-directed," "there was no evidence of any psychotic symptoms," there "was no odd or bizarre behavior," and Plaintiff had "mild difficulty following instructions." (Id.) Dr. Glassman also found Plaintiff "presented as average intellectual functioning" and "alert and oriented." (Id.) Plaintiff was able to repeat three words immediately and remember all three words after five minutes, did Serial 3's[2] without error, performed a money-changing problem correctly, interpret a proverb appropriately, knew the current and recent past presidents, knew the sun rise from the cast, and knew the capital of California. (Id.)

Dr. Glassman formally diagnosed Plaintiff with (1) pain disorder with medical and psychological factors/adjustment disorder with depression and anxiety, (2) probable Borderline Personality Disorder, (3) muscloskeletal/orthopedic problems, (4) stressors of lack of work and financial problem, and (5) a current Global Assessment of Functioning ("GAF")[3] score of 70 from a psychiatric perspective because he has problems doing his grooming and household chores. (Id. at 476–77.)  Dr. Glassman found:

> From a psychiatric perspective, [Plaintiff] is capable of behaving in a socially-appropriate manner and of getting along adequately with others. He is capable of understanding and following at least simple instructions. He has moderate impairment in his capacity to maintain concentration, persistence, and pace, and to adapt to changes and stresses in a workplace setting, due to his depression, anxiety,

---

[2] "Serial Threes" are tests used to assess a patient's concentration, during which a patient is asked to count backward from 100 by threes. See Salmon v. Astrue, No. 10-CV-03636-LHK, 2012 WL 1029329, at *6 n.3 (N.D. Cal. Mar. 26, 2012).

[3] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir.1998).

1    and dysfunctional personality features.

2    (Id. at 477.) Dr. Glassman also noted "consistent, appropriate mental health treatment

3    could help decrease [Plaintiff's] symptoms and improve his functioning" and "[Plaintiff]

4    is capable of managing his own funds." (Id. at 477.)

5         The ALJ categorized Dr. Glassman as an examining physician and gave Dr.

6    Glassman's opinion partial weight. (AR 23.)  ALJ stated the following regarding Dr.

7    Glassman's opinion:

8         Psychological CE Jaga Glassman, M.D., provided a medical source statement to
9         which the undersigned ALJ accords partial weight. Dr. Glassman opined the
          claimant is capable of behaving in a socially-appropriate manner and of getting
10        along adequately with others and is capable of understanding and following at least
          simple instruction. (EX 5F/05). This part of Dr. Glassman's opinion is given
11        significant weight because Dr. Glassman is an accepted medical source who
          examined the claimant directly and the conclusions are consistent with the bulk of
12        the evidence in the record. For example, in May 2016, the claimant had a telehealth
          examination with Dawn Michelle, Long M.D., who noted the claimant reported
13        "no depression" (EX 3F/24). Less weight is given to the part of Dr. Glassman's
          statement in which he opined the claimant has moderate impairment in his capacity
14        to maintain concentration, persistence, and pace, and to adapt to changes and
          stresses in the workplace setting, due to his depression, anxiety, and dysfunctional
15        personality features (id) because this conclusion is based on claimant's complaints
          of pain and the conclusion is not consistent with Dr. Glassman's own exam
16        findings.

17

18

19   (AR 23.)

20        The ALJ properly rejected Dr. Glassman's opinion that Plaintiff had moderate

21   impairments in the third and fourth functional areas by providing clear and convincing

22   reasons supported by substantial evidence.[4] The ALJ stated he discounted that portion of

23   Dr. Glassman's opinion because it contradicted Dr. Glassman's own exam findings and

24   was based on Plaintiff's self-reported symptoms. (AR 23.) "A conflict between treatment

25

26   _____

     [4] In his brief, Plaintiff states that the ALJ was required to set out specific and legitimate reasons for
27   giving portions of Dr. Glassman's opinion less weight. (Doc. No. 16 at 11.) This standard is incorrect.
     Because the ALJ did not argue that Dr. Glassman's opinion was contradicted by other physicians, the
28   ALJ needed to provide "clear and convincing" reasons supported by substantial evidence to discredit Dr.
     Glassman. See Lester, 81 F.3d at 831.

notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." Ghanim, 763 F.3d at 1161 (citing Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692–93 (9th Cir. 2009)). "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as credible." Tommasetti, 533 F.3d at 1038 (citing Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999)).

In rejecting Dr. Glassman's moderate finding in the third functional area of concentrating, persisting, or maintaining pace, the ALJ noted Dr. Glassman included in her report Plaintiff's self-report that his ability to focus and concentrate is decreased due to pain. (AR 17.) However, the ALJ also noted that Plaintiff had perfect results on the tests Dr. Glassman's administered, including Serial 3's. (AR 17.) Similarly, in rejecting Dr. Glassman moderate finding in the fourth functional area of adapting and managing oneself, the ALJ emphasized the GAF score of 70 Dr. Glassman assigned Plaintiff. (AR 18.) The ALJ noted that a GAF score of 70 falls within the 61-70 range that "indicates mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning…, but generally functioning pretty well, has some meaningful interpersonal relationships." (AR 19); see also Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions, 34 (4th ed. 2000). Accordingly, the ALJ did not error in finding that Dr. Glassman's assessment of moderate limitations in the third and fourth areas of function were inconsistent with her treatment notes and discounting her opinion on that basis.

Plaintiff next argues the ALJ improperly cherry-picked the medical evidence of treating physician Dr. Dawn Michelle Long, M.D., (Doc. No. 16 at 13), and failed to consider the medical evidence from Dr. Long and treating physician Dr. Dodge that Plaintiff suffers from "'uncontrolled' diagnosed mental impairments." (Doc. No. 16 at 6–8, 12.) According to the record, Dr. Long, an internal medicine physician at Sharp Rees-Stealy Medical Group, saw Plaintiff approximately five times from February 22, 2016 to

May 29, 2018. (AR 422, 427, 429, 551, 557.) On February 22, 2016, Dr. Long at Sharp Ree-Steal Medical Group saw Plaintiff to establish care. (AR 422.) Dr. Long assessed that Plaintiff had anxiety and depression, and started Plaintiff on 50 mg daily of Zoloft. (AR 425.) On March 3, 28, 2016, Dr. Long had telehealth visit with Plaintiff. (AR 427.) Dr. Long noted that Plaintiff did not feel like the 50 mg daily dose of Zoloft was working, so Dr. Long increased the dosage to 100 mg a day. (AR 427.) On May 31, 2016, Dr. Long had another telehealth visit with Plaintiff.(AR 429.) Dr. Long noted that Plaintiff had started taking 150 mg of Zoloft daily and Plaintiff "thinks it's working well and it's the right dose." (AR 429–30.) On September 26, 2017, Dr. Long met with Plaintiff. (AR 551.) Dr. Long reported that the 150 mg of Zoloft daily was working okay but that Plaintiff reported feeling more depression. (AR 551.) In the same report, Dr. Long reported that Plaintiff's anxiety and depression was not controlled with 150 mg Zoloft daily and Dr. Long recommended increasing to 200 mg daily. (AR 555.) On May 29, 2018, Dr. Long met with Plaintiff. (AR 557.) Dr. Long reported that Plaintiff was continuing to take 200 mg Zoloft daily and that it "helps some" and "some days feel better than others." (AR 557.) Dr. Long reported that Plaintiff's anxiety and depression was controlled with 200 mg of Zoloft daily. (AR 560.) Dr. Long also reported that Plaintiff asked about how to taper the dosage if he decides to and Dr. Long told Plaintiff he could decrease the Zoloft dose by "50 mg every 2–3 weeks and ending with 25 mg daily 2-3 weeks versus 50 mg every other day 2–3 weeks." (AR 560.)

Dr. Dodge, an orthopedic surgeon from San Diego Orthopaedic Associates, began seeing Plaintiff in 2011. (AR 491.) The administrative record includes Dr. Dodge's notes from approximately 25 meetings Dr. Dodge had with Plaintiff from May 2015 to April 2019. (AR 357–406, 479–533, 591–723.) Dr. Dodge primarily provided medical evidence and opinions related to Plaintiff's physical impairments, which are further discussed in the next section, but also provided several medical opinions regarding Plaintiff's mental impairments. On May 22, 2015, prior to the date of disability onset, Dr. Dodge saw Plaintiff and reported:

> [Plaintiff] suffers from significant psychological issues. The combined effects of his psychosocial disorder along with his pain has left this individual in a precarious situation where I agree that he cannot work in his current job. He is by no means malingering. He does have 'real pain,' but it revolves around significant stress and psychological disease. It is outside by areas of expertise to comment on the issue of AOE/COE as it related to this disease process. I do not feel [Plaintiff] at this time, as a medical doctor, is safe to be at work. I believe, he could injure himself or others by his current psychological state. Realistically, therefore, I believe the patient is back to his permanent and stationary status, but I believe it is in the best interest of all parties to not allow him to work his prior job and he will have to apply for social security disability.

(AR 405.) On June 23, 2015, Dr. Dodge reported Plaintiff "is extremely stressed and has significant psychological issues because of his chronic pain." (AR 401.) On February 19, 2016, Dr. Dodge reported that an examination of Plaintiff "disclosed an extremely anxious distressed gentlemen…" (AR 380.) On January 30, 2017, Dr. Dodge provided a medical opinion on Plaintiff and reported that Plaintiff "suffers from pronounced anxiety and depression" and noted that he believes Plaintiff's "chronic pain coupled with his chronic depression and his chronic depression and his chronic anxiety has made Mr. Lee, in essence, unemployable, as he cannot think clearly to hold down gainful employment." (AR 491–92.) On December 19, 2017, Dr. Dodge saw Plaintiff and reported that Plaintiff's treatments, including the Zoloft prescribed by Dr. Long, provided Plaintiff with "fair enough relief that he can participate with his wife at home in performing activities of daily living. (AR 613.)

At step two, the ALJ mentioned portion of Dr. Long's May 2016 treatment note to support giving portions of Dr. Glassman's opinion significant weight. (AR 23.) Other than that reference, the ALJ did not mention Dr. Long's and Dr. Dodge's medical evidence and opinions related to Plaintiff's mental impairments. The "ALJ must consider all medical opinion evidence," Tommasetti, 533 F.3d at 1041 (citing 20 C.F.R. § 404.1527(b)). But the ALJ "need not discuss all evidence presented to [him]." Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394–95 (9th Cir. 1984); see also Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). "Rather, [the ALJ] must explain why

'significant probative evidence has been rejected." <u>Vincent</u>, 739 F.2d at 1395. The ALJ did not reject Dr. Long's or Dr. Dodge' medical evidence or opinion. Instead, the ALJ accepted both Dr. Long's and Dr. Dodge's opinions in determining Plaintiff has "medically determinable mental impairments of anxiety and depression." (AR 17.) The ALJ finding that Plaintiffs anxiety and depression "are controlled" is also consistent with the longitudinal records of Dr. Dodge and Dr. Long. (<u>Id.</u>); <u>see, e.g.</u>, <u>Ramirez v. Astrue</u>, 803 F.Supp.2d 1075, 1084 (C.D. Cal. 2011) ("[A]n ALJ's failure to address a reviewing physician's opinion may be harmless error when the ALJ's opinion is consistent with that opinion."). As such, the ALJ did not error in not discussing Dr. Long's and Dr. Dodge' medical evidence and opinions related to Plaintiff's mental impairments at step two. Further, even if the ALJ erroneously found Plaintiff's mental impairments were non-severe rather than severe at step two, this would be harmless error because the Plaintiff ultimately prevailed on step two and the ALJ considered Plaintiff's medically determinable mental impairments at later steps. See <u>Buck v. Berryhill</u>, 869 F.3d 1040, 1048 (9th Cir. 2017); <u>Loader v. Berryhill</u>, 722 Fed. Appx. 653, 655 (9th Cir. 2018).

Finally, Plaintiff argues the ALJ errored by not considering Plaintiff's medically determinable mental impairments when determining Plaintiff's RFC and in determining Plaintiff was not disabled at step four. (Doc. No. 16 at 10.) "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of the individual's impairments, even those that are not 'severe.'" <u>Buck v. Berryhill</u>, 869 F.3d 1040, 1049 (9th Cir. 2017). "The RFC therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not." <u>Id.</u> Here, the ALJ did not find any RFC mental limitations. (AR 19.) But the ALJ properly considered Plaintiff's medically determinable limitations in assessing Plaintiff's RFC by giving substantial weight to Dr. Glassman's opinions that Plaintiff "is capable of behaving in a socially-appropriate manner and of getting along adequately with others and is capable of understanding and following at least simple instructions." (AR 23.) The ALJ also questioned the vocation expert on hypothetical questions related to limitation based on mental impairments. (AR

68–69.) As such, the ALJ properly considered Plaintiff's medically determinable mental impairments when determining Plaintiff's RFC and at step four.

### B. The RFC Assessment

Plaintiff argues the ALJ improperly rejected treating physicians Dr. Dodge's and Dr. Toliver's medical opinions regarding Plaintiff's RFC limitations absent "specific and legitimate" reasons. (Doc. No. 16 at 19.) Specifically, Plaintiff argues the ALJ committed harmful error by rejecting Dr. Dodge's opinion that Plaintiff is preclude from "lifting over 10 pounds" and that Plaintiff could "work anywhere from 4 to 8 hours." (Id. at 19, 26–30.) Plaintiff also argues the ALJ committed harmful error by failing to properly consider Dr. Dodge's opinion and medical examination evidence of Plaintiff's limitation and pain regarding his neck. (Id. at 19–24.) Finally, Plaintiff argues the ALJ improperly rejected Dr. Toliver's July 11, 2017 conclusion that Plaintiff suffers from "chronic cervicalgia." (Id. at 19.) The Commissioner argues the ALJ's RFC finding was properly based on a synthesizes the weight of the evidence and is supported by substantial evidence. (Doc. No. 19 at 6.) The Court agrees with the Commissioner.

The RFC is used at step four to decide if a claimant can do past relevant work. 20 C.F.R. § 416.945(5)(i). A claimant's RFC "is the most [a claimant] can do despite [his or her]" limitations." 20 C.F.R. 416.945(a)(1); see also Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) ("The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.") The ALJ is "responsible for assessing [the] residual functional capacity. 20 C.F.R. § 404.1546(c). The ALJ must determine a claimant's RFC "based on all of the relevant medical and other evidence," and will consider "any statements about what [the claimant] can still do that have been provided by medical sources" and "descriptions and observations of [the claimant's] limitations" provided by the plaintiff and other non-medical sources. 20 C.F.R. § 416.945(3); Laborin, 867 F.3d at 1153.

Before step four, the ALJ determined Plaintiff has the RFC to:

[L]ift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; able to stand and/or walk 6 hours and sit 6 hours in an 8 hour workday with normal break; able to reach overhead frequently bilaterally. In addition, the claimant cannot engage in more than occasional rotation, flexion, or extension of the neck; frequently able to handle and finger bilaterally; should avoid concentrated exposure to loud noise.

(AR 19.)

Relevant to Plaintiff's motion are Dr. Dodge's medical opinions on January 30, 2017 and April 5, 2019. (Doc. No. 16 at 19, 26.) On January 30, 2017, Dr. Dodge noted that when Dr. Dodge began seeing Plaintiff, Plaintiff was in "tremendous pain in his neck with radiating pain into the shoulder and arms following a cervical spinal operation" performed by another doctor. (AR 491.) Dr. Dodge also noted that Plaintiff had a second surgery on his neck that was unsuccessful. (Id.) Dr. Dodge stated that Plaintiff "is precluded from lifting over 10 pounds, precluded from repetitive twisting and turning of the head and neck, precluded from prolonged head and neck and flexion-extension." (AR 492.) On April 5, 2019, Dr. Dodge reported that Plaintiff "remains permanent and stationary." (AR 699.) Dr. Dodge stated that Plaintiff "tends to 'fatigue' towards the end of is day when his symptoms of pain tend to increase. So the number of hours he could work would vary from day-to-day, anywhere from 4 to 8 hours depending upon his complaints of pain on any particular day." (AR 700.) Dr. Dodge also reported that Plaintiff has "mild right carpal tunnel ,but no radiculopathy," "trace amount of give-way weakness of the finger extensors bilaterally," "diminished sensation to light tough through the right hand predominately the fourth hand fifth digits," and "[h]is reflexes were diminished and symmetrical." (AR 699.)

Dr. Toliver is an interventional pain management physician from San Diego Orthopaedic Associates. The administrative record includes Dr. Toliver's notes from several meetings Dr. Toliver had with Plaintiff from 2015 to 2019. (AR 357–406, 479–533, 591–723.) Relevant to Plaintiff's motion are Dr. Dodge's medical opinion from July 11, 2017. (Doc. No. 16 at 19.) On July 11, 2017, Dr. Toliver saw Plaintiff and reported

that "has chronic cervicalgia, which severely limits his ability to perform activities." (AR 496.) Dr. Toliver further noted under the "subjective complaints" section, that Plaintiff reported "[h]e especially has problems with any upward or downward gazing and has to essentially keep his neck in neutral position as much as possible." (AR 496.)

The ALJ summarized medical evidence from Dr. Dodge's and Dr. Toliver's examinations and treatments of Plaintiff from 2016 through 2019. (AR 21–22.) The ALJ then categorized Dr. Dodge as a treating physician and gave Dr. Dodge's April 2019 opinion some weight and his January 2017 opinion little weight. (AR 22.)  ALJ stated the following regarding Dr. Dodge's and Dr. Toliver's opinions:

> As for the opinion evidence, treating physician Larry Dodge, M.D., completed a medical source statement in April 2019 and opined the claimant tends to "fatigue" towards the end of his day when his symptoms of pain tend to increase, and therefore the number of hours he could work would vary from day-to-day, anywhere from 4 to 8 hours, depending upon his complaints of pain on any particular day (Ex 12F/05). The opinion of Dr. Dodge is given some weight because he is an accepted medical source who examined the claimant directly and the conclusions are consistent with the bulk of the evidence in the record. For example, in July 2016, Dr. Dodge examined the claimant and noted the claimant had a lot of spasm through the neck, but Dr. Dodge also reported a motor examination was normal in all major muscle groups of the upper extremities and a sensory examination was normal to light touch, and found the claimant had a full range of motion in all major joints of the upper extremities (Ex 6F/08). Overall, this opinion of Dr. Dodge is consistent with the residual functional capacity above. In January 2017, Dr. Dodge opined the claimant is precluded from lifting over 10 pounds precluded from repetitive twisting and turning of the head and neck, precluded from prolonged head and neck flexion-extension (Ex 7F/02). This opinion is give[n] little weight because it is overly restrictive and not consistent with the physical examinations findings in the record around this time. For example, in July 2017, Dr. Dodge examined the claimant and found the claimant had a full range of motion of all major joints of the upper extremities, and found a motor examination and sensory was normal (Ex 11/32). In April 2107, Kevin Toliver, M.D., examined the claimant and found a motor examination was normal in all major muscle groups of the upper extremities (Ex 11F/43). Dr. Toliver found a sensory examination

The ALJ provided "specific and legitimate" reasons supported by substantial evidence for assigning "little weight" to Dr. Dodge's medical opinion that Plaintiff is

"precluded from lifting over 10 pounds." (AR 22.) The ALJ cited as contradictory medical evidence Dr. Dodge's July 2017 report that Plaintiff had a full range of motion of all major joints of the supper extremities and Plaintiff's motor examination and sensory were normal. (AR 22.) The ALJ also cited as contradictory medical evidence Dr. Toliver's April 2017 report that Plaintiff's motor examination was normal in all major muscle groups of the upper extremities, Plaintiff's sensory exam was normal to light touch, and Plaintiff had full range of motion of all major joints of the upper extremities. (AR 22–23.) Dr. Dodge's opinion was also contradicted by the nonexamining physician opinions of both DDS medical consultants Dr. S. Brodsky, D.O. and Dr. Yvonne Post, D.O., who each provided the medical opinion that Plaintiff can lift up to 20 pounds occasionally and no more than 10 pounds frequently. (AR 23.)

The ALJ also properly considered Dr. Dodge's and Dr. Toliver's opinions regarding Plaintiff's neck limitations. The ALJ assessment of Plaintiff's RFC included the limitation that Plaintiff "cannot engage in more than occasional rotation, flexion, or extension of the neck." (AR 19.) "Occasionally" is defined as "occurring from very little up to one-third of the time." SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 23 (1983). The ALJ's finding is consistent with both Dr. Dodge's opinion that Plaintiff was "precluded from repetitive twisting and turning of the head and neck, [and] precluded from prolonged head and neck and flexion-extension," (AR 492), and Dr. Toliver's opinion that Plaintiff is "has chronic cervicalgia, which severely limits his ability to perform activities." (AR 496.)

Finally, the ALJ appropriately considered Dr. Dodge's April 2019 medical opinion that Plaintiff can "work anywhere from 4 to 8 hours depending on his complaints of pain on any particular day." (AR 22.) The ALJ stated he gave Dr. Dodge's opinion some weight because Dr. Dodge is a treating physician and his conclusions are consistent with the bulk of the record. (Id.) The ALJ did not reject Dr. Dodge's opinion as Plaintiff aruges, but instead stated "this opinion of Dr. Dodge is consistent with the residual functional capacity above." (Id.) The ALJ's RFC assessment that Plaintiff can "stand

and/or walk 6 hours and sit 6 hours in an 8 hour workday with normal breaks" reflects Dr. Dodge's medical opinion that Plaintiff can "work anywhere from 4 to 8 hours" since the RFC is supposed to represent the most a claimant can do despite the claimant's limitations. 20 C.F.R. § 404.1545(a)(1). The RFC and Dr. Dodge's opinion are also consistent with Dr. Brodksy's and Dr. Post's medical opinions that Plaintiff can "stand/walk for 6 hours in an 8-hour work day and sit for 6 hours in an 8-hour work day," which the ALJ gave significant weight. (AR 23.)

In assessing Plaintiff's RFC, the ALJ considered Plaintiff's allegations of his symptoms and limitations as well as the third-party statement of Plaintiff's sister-in-law, Christine Ann Esh. (AR 20, 24.) The ALJ summarized medical evidence provided by Dr. John Grant, M.D., Dr. Naomi Smith, M.D., Dr. Toliver, Dr. Dodge, and Dr. Jonathan Schleimer, M.D. (AR 19–22.) The ALJ also properly considered and weighed the medical opinions of Dr. Dodge, Dr. Brodsky, Dr. Post, and Dr. Glassman. (AR 23.) Finally, the ALJ noted his own observation that Plaintiff had "fatigue-related deterioration" over the course of eight hours at July 2019 hearing before the ALJ. (AR 24.) The ALJ determine Plaintiff's RFC by considering "all of the relevant medical and other evidence" as well as "any statements about what [Plaintiff] can still do that have been provided by medical sources" and "descriptions and observations of [Plaintiff's] limitations" provided by the plaintiff and other non-medical sources. 20 C.F.R. § 416.945(3); Laborin, 867 F.3d at 1153. As such, the ALJ did not error in assessing Plaintiff's RFC.

**C. Credibility Determination**

Plaintiff argues the ALJ committed harmful error by failing to provide "clear and convincing" reasons for rejecting the severity of Plaintiff's symptomology evidence. (Doc. No. 16 at 30–37.) Specifically, Plaintiff argues the ALJ did not identify which aspects of the medical evidence and longitudinal record were inconsistent with Plaintiff's allegations of disabling symptoms and limitations. (Id. at 32.) The Commissioner argues that the ALJ properly considered Plaintiff's subjective claims. (Doc. No. 19 at 8–10.) The

Court agrees with the Commissioner.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007); Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter, 504 F.3d at 1036 (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). This test requires that the causal relationship between impairment and symptoms be "a reasonable inference, not a medically proven phenomenon." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

If Plaintiff meets this first test, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Lingenfelter, 504 F.3d at 1036 (quoting Smolen, 80 F.3d at 1281). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Ghamin v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (citing Lester, 81 F.3d at 834). "To assess a claimant's credibility, the ALJ may consider, among other factors, 'ordinary techniques of credibility evaluation,' 'inadequately explained failure to seek treatment or to follow a prescribed course of treatment,' and 'the claimant's daily activities.' The ALJ must also consider factors including the 'observations of treating and examining physicians and other third parties regarding ... the claimant's symptom [s]; ... functional restrictions caused by the symptoms; and the claimant's daily activities.'" Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (quoting Smolen, 80 F.3d at 1284).

At the July 6, 2019 hearing before the ALJ, Plaintiff testified regarding his symptoms. (AR 31–74.) Plaintiff testified that he quit his job as a technical support specialist on May 12, 2015 because he "couldn't take the pain anymore." (AR 43.) Plaintiff testified he experiences pain in his "neck, upper back, cervical spine, muscles,"

and that "just dropping my chin just a little bit creates a problem." (AR 43, 58.) Plaintiff testified that the repetitive motions, such as looking down or typing into a computer, hurts and that when Plaintiff was working, "it was so bad I wore a…cervical collar…to keep my neck from going down so much." (AR 44, 54) Plaintiff testified that he still uses the cervical collar when riding in a car. (AR 51.) Plaintiff testified that he had problems "keeping up, dealing with, mentally, dealing with pain, fluctuating pain when the pain meds would start to wear off." (AR 54.) Plaintiff testified that he missed a lot of time at work due to the pain causing him to overuse his Family and Medical Leave Act ("FMLA") leave and that he eventually quit his job because he "couldn't mentally or physical keep pushing [himself] the way I was. The pain was so much." (AR 55.) Plaintiff  testified that while he can intermittently get the pain down, there is no point at which he does not have some level of pain. (AR 55.) Plaintiff testified that he gets inflammation in his muscles, upper back, and shoulders, which causes his skin to get hot and ears to turn red. (AR 56.) Plaintiff further testified that he experiences muscles spasms daily in his upper back and neck area, which causes tightness, achiness and his "upper back and neck ache like hell." (AR 57.) Plaintiff further testified that at "intermittent times…[he'll] get these sharp pains in [his] hands, as if someone poked you with a needle" (AR 57.) Plaintiff testified that he can type for minutes to a half hour before experiencing these symptoms. (AR 58.) Plaintiff testified that he has to lay down for sometimes hours after doing tasks much as using the computer for a few minutes, watching TV, making breakfast, or doing household chores. (AR 61–62.) Plaintiff further testified that he has a tremor in his hand that causes his hands to shake "intermittently". (AR 53.) Plaintiff testified that this causes him to fumble or drop objects and causes his hands to start aching. (AR 53.)

The ALJ first provided a summary of Plaintiff's subjective testimony:

The claimant testified he can no longer work due to pain. The claimant reported he has pain in his neck, upper back, and cervical spine. The claimant testified he underwent surgery in October 2008 and in June 2013. The claimant reported he experience[s] pain and inflammation in the shoulders. The claimant testified he

usually lays down around 1:30 pm or 2:00 pm. The claimant estimates he can sit for about one-half hour to an hour before needing to change position. The claimant estimated he can lift for about 10 to 20 pounds. To alleviate his pain, the claimant testified he saw a psychiatrist may years ago, but is not presently seeking a psychiatrist. The claimant reported he started taking mental health medications in the 1990s and discontinued it, but started taking mental health medications against about two years prior to the hearing.

(AR 20.)

For the first step of the credibility analysis, the ALJ noted that "objective medical evidence shows a history of anterior cervical fusion at C5-C6 and C6-C7 with disc replacement surgery at C3-C4 with adjacent stenosis at C4-C5." (AR 20.) The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 20.)

The ALJ next turn to the second step of the credibility analysis and found that "the clinical findings of the examining medical sources fails to support the claimant's allegations of disabling symptoms and limitations." (Id.) The ALJ specific stated that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence and evidence in the record," (AR 20.) The ALJ then summarized the medical evidence provided by Dr. Grant, Dr. Smith, Dr. Toliver, Dr. Dodge, and Dr. Schleimer. (AR 21–22.) The ALJ cited some medical evidence that corroborated Plaintiff's testimony regarding his pain and limitations, but the ALJ also cited medical evidence the ALJ could reasonably conclude went against Plaintiff claim's concerning "the intensity, persistence and limiting effects of [Plaintiff's] symptoms." (AR 20–22.) For example, the ALJ cited Dr. Grant's finding in August 2015 that Plaintiff's "neck was supple" and that Plaintiff had "normal joint range of motion in the musculoskeletal system and merely muscle soreness posterior neck muscle soreness low back." (AR 20–21.) The ALJ also cited Dr. Dodge's findings in July 2016, October 2016, and July 2017 that Plaintiff had full range of motion of all major joints of the upper extremities and a normal motor examination in all major muscle groups of the upper extremities. (AR 21–22.) After reviewing the medical evidence, the ALJ determined "the

totality of the objective medical evidence and longitudinal record fails to support the claimant's allegations of disabling symptoms and limitations." (AR 22.)

The ALJ's reasons for his adverse credibility determination are sufficient. The ALJ recorded the relevant parts of Plaintiff's testimony, reviewed the record, and addressed which parts of the record undermined Plaintiff's statements. (AR 20–22.) The ALJ did not make "general findings," <u>Ghamin</u>, 763 F.3d at 1163, but rather specifically showed why he came to his determination by making findings based on the medical record. (AR 20–22.) As a result, the ALJ has met his requirement for providing "specific, clear and convincing reasons" for making an adverse credibility determination for Plaintiff's testimony. <u>Lingenfelter</u>, 504 F.3d at 1036.

## CONCLUSION

The ALJ's decision was supported by substantial evidence and was based on proper legal standards. Accordingly, the Court grants the Defendant's cross-motions for summary judgment and denies Plaintiff's motion for summary judgment.

**IT IS SO ORDERED.**

DATED: March 29, 2022

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT